A.T.N. Industries v. Gross, No. 15-20102, Mr. Alonzo. Thank you, Your Honor. May it please the Court, my name is Yosel Alonzo, and I represent Mauricio Gross, Clara Shorts Gross, Appellants for Lawn Systems Company in Business Management Services International, also called BMSI. We are very thankful to be able to be here today to present our arguments. And the reason we're here is because a procedure that is used or intended to be used to prevent irreparable harm is causing irreparable harm to a family, and this is the only remedy that we have to address that. And the order, the preliminary injunction that was issued, not only was overbroad and vague and does not allow this family to really earn a living, but it was done for no good reason. Twenty thousand a month isn't enough to earn a living? It's above the poverty line. May I respond? I said it's above the poverty line even for high flyers. As is evident from the record, we have a unique family. Mr. Gross has undergone organ transplant. Both of his children have very extremely serious medical situations that have involved many surgeries, traveled to New York. In addition to that, Your Honor, I am one attorney. I am having to defend the Gross family against, I've counted at least six attorneys in two law firms on the other side, that have basically limitless resources to throw at us and have done so. It is evident from the record. In addition to that, Judge Jones, the order itself basically, not basically, you know, says that we cannot, Mr. Gross cannot open, close, transfer any funds whatsoever. It is not limited to any funds that are in dispute in this case, but include any funds of any type that belong to him. So if he goes to work for Walmart, those funds are included in this, and he can only spend the $20,000 from those specific accounts that have been designated by the court. There was no call for that. It's unnecessary. It really, you know, more than addresses, assuming that there was something that they had done wrong, which there wasn't, it is overkill. What about the predicate of the Hoyt injunction itself? There was no predicate for the injunction itself, Your Honor, and we've addressed that in several ways. My main concern is that the predicate for the injunction itself was the burden of proof was reversed. As is evident from the record in Judge Hoyt's comments, the burden was put on us to disprove their case. They did not have the burden to make their case of a probability of being able to prevail on the merits. Well, what is all this evidence in the record about all the different transactions? I mean, they have the three exemplary transactions in their brief, but all of the different accounts that were opened with sort of misleading names and the complicated paper trail for all the transactions and so on. I mean, that looked like evidence to me. And I think that was the intent, Judge. If you could throw enough stuff on the wall, then maybe it would look like that. We've addressed every single one of those, every single penny in the summary exhibits that we provided with references to not only their complaint but also their testimony. Forgive me, but I looked at that, and I couldn't tell that this answered anything other than a lot of money was being moved around for a lot of different reasons. And all it left me with was a great suspicion that somebody was up to no good. I couldn't conceive what kind of business purpose was not offered as to why that money would be moved in this particular way for a particular account. And maybe I need somebody that had an account or somebody to assess me with those forms, but I didn't get there from the . . . Judge, and I believe we not only explained that but also put in the brief the authorities that a suspicion of wrongdoing is not sufficient grounds for an injunction. But the problem here, Judge, is that the burden of proof was reversed on that. It was put on us to show that there was some issue with that. Judge Hoyt specifically said that on 4920 of the record. Who would know better? Well, we did explain the transactions set by set, and to this day they haven't disputed one penny of the summary that we provided as being correct. I think the point is that, as I understand it, your charts show that the Chinese steel companies all got paid what they owed. But the difference between the contract price and those other prices is a lot of money. It's a lot of money, and it went into all these various accounts, and some of it went to the intermediaries, the other defendants in . . . I guess they're not defendants, but the ones in Hong Kong and so on. Judge Jones, they were very complicated transactions. Why? Basically, forty million . . . Why were they complicated? There were forty million dollars worth of transactions. Well, I mean, in the oil industry, they do that with an invoice in the U.S. So, why were these transactions having to go through so many intermediaries? The reason for that is this. The principals of the plaintiffs did not want their fingerprints with regard to any of the companies that they established to do business in Venezuela. They did not want to show the Venezuelan government that they were the owners of these companies. And so, that's step number one was for that reason. They wanted to say they were not the owner of Jafang? Correct. Okay. Why? Correct. Because they were in litigation with Bariven at the time and did not want to not get the order as a result of also being the owner of Jafang Americas. That's on the one hand . . . Is that because they were stealing money from the Venezuelans also? Because they were, in my view, what they were doing was money laundering in Venezuela. Well, I want to know what your view is. I guess I want to know what your . . . So, your explanation is that Mr. Gross was doing all of this with the knowledge and approval of his bosses? Absolutely. And not only that, then to finish the answer . . . There's evidence of that in the record. Right. Well, the evidence is in the exhibits that we provided with the court shows that all the contracts, in evidence, were provided to the Venezuelans. So, they saw the contracts . . . Has the client's deposition been taken? Yes, it has been taken. And did they, in the taking of that deposition, did they walk him through the transactions and ask him to explain under oath what happened? Yes, they did. Okay. Yes, they did. They still, to this day, haven't disputed one penny of the summary exhibits that we have shown the court. Is that deposition filed and in the record? Yes, it is. Yes, it is. And, on the other hand, the issue was that the Chinese companies did not want to show any ownership of companies or that they were dealing with their own companies. So, you had two sets of principles in China and Venezuela that had particular, I guess, commercial needs, let's call them, that they wanted to fulfill. As if a lot of this might not have satisfied the standard of the Foreign Corrupt Practices Act. But, the point is, your client, as soon as he resigned, went to China with his father and took out nearly a million dollars from some of these accounts. Yes, he did. And he didn't explain why he did it, right? Yes, he did. In depositions, he did, Judge Jones. He is very afraid of the plaintiffs, physically afraid for the safety of himself and of his family. Does he have a green card? He's an American citizen and so is his wife. But, they're very afraid of these people. And, I guess the best way I can explain it to you, Judge Jones, is, and I guess the bottom line issue is, the question of, can a criminal organization use our laws, use our RICO laws, use our fraud laws to sue one of their employees? That's what we have here. These are very strong accusations, but your brief doesn't raise any of them. We tried to raise those before Judge Hoyt. He did not want to go into those areas at all. He, in fact, the record shows that he was of the view that that was one of the ultimate issues in the case, and he didn't want to go into it. And that's at the record 49-20, I believe. Into those particular issues. And, the issues with regard to whether the entire deal as structured, as Judge Jones has mentioned, was illegal. In my view, it was very relevant, because if you've got an illegal deal, then under the law, then our courts can't be used to further that illegal deal. Why did . . . I mean, I'm not challenging your judgment in appealing this preliminary injunction, but wouldn't it have been advisable to tell Judge Hoyt, we're ready to go to trial, let's go to trial? We, you know, Judge Jones, 20-20 hindsight, maybe so. Quite frankly, we were just being inundated with discovery requests. We produced over 20,000, some 20,000 pages of documents. Deposition requests, and with a limited budget, and again, six lawyers on the other side, and the burden of proof being reversed. Because what Judge Hoyt said was, no, that's your burden of proof to show that what is being asked and done is unreasonable. They've asked. I've given. You should be saying, this is unreasonable for these reasons. That's what the paper should be saying. And to me, that is fundamentally reversing the burden of proof in the case, and that's what happened. It wasn't . . . it was, as you pointed out, saying, okay, we've got all these smoke, we've got all these transactions and stuff like that, so there must be something wrong. Unless, of course, you can prove to me that there's nothing wrong. And that's not what the law is. That's not the standard with respect to injunctive relief. Did transaction by transaction and relate the testimony and the evidence with regard to particular transactions? No, but you say he took his deposition. But does anybody sit down and say, with regard to this particular transaction, this is the evidence regarding it. This is what it was for. This is what happened, et cetera, et cetera, et cetera. You didn't drop it at all, and it was hot. They did . . . the plaintiffs did take his deposition, Your Honor, and we tried to do that with the summary exhibits. For example, with the wire transfer payments to Jafang Americas, showing precisely how all of these funds were used and paid. And that is instead of repeating . . . There's money moving, but there's no explanation about for what and so forth. There was no subsequent hearing, oral hearing, where that happened. Basically, this was submitted, and the judge asked us to submit findings, facts, and conclusions of law. And then five days later, Judge Hoyt signed their proposed findings, facts, and conclusions of law without changing a comma. Fifty-three pages of findings, facts, and conclusions of law. And so there wasn't that hearing. But, for example, Hula Dow, that's Exhibit 43. We show every payment, how it made its way to the factory. What they want to do is they want to draw little, you know, exhibits and showing arrows going everywhere and all this kind of stuff. To me, the relevant . . . No, mine was bad enough that I couldn't read the small print. However, I mean, there were a lot of intermediary movements of money before, and your client had opened up this account that said, like, Hula Hula instead of Hula Dow, and, you know, Jafang instead of Jafang Steel. And so, you know, there are a lot of intermediate steps here. There were, as instructed by the Chinese factories, and we put the evidence in with regard to specific emails, showing how the Chinese factories wanted us to set up the accounts. For example, one of them is Defendant's Exhibit 18, which is a specific example of instructions that we were receiving with regard to the bank accounts. There's no rule of thumb. One does not go in disguise except to deceive. Judge, the other rule . . . I hadn't heard that one, but a lot of people dress up for Mardi Gras that, you know, may or may not disagree with that. I don't know. What I do know is that, as far as I know, it's still not illegal in America to open bank accounts or to establish companies. And that's basically . . . the sin is having lots of bank accounts. My time is up. Thank you. Thank you very much for your time. Mr. Higgins? Good morning, Your Honors. Just for my information, are the principals of ATN American citizens? I believe both are . . . of ATN, Your Honor? Yes, sir. I'm not aware of all of the citizens . . . all of the owners of ATN. I know the primary parties are Mr. Cardenas and Mr. Benediz. Well, Mr. Riccardo Richard Schwartz, the father-in-law of Mr. Gross . . . Mrs. Gross, Your Honor. . . . is Venezuelan. Correct. And both Mr. Benediz and Mr. Cardenas are Venezuelan nationals. But you don't know whether they're American citizens. I was just wondering. I do not believe . . . I know that they may maintain a residence in the U.S. but I don't know under what pretense, Your Honor. May it please the Court, John Higgins, Heather Hatfield for the appellees and plaintiffs in the underlying litigation. First, Your Honors, I'd like to first address a couple of points raised by Mr. Yossel. Causing irreparable harm to the family. There's no evidence of that. He didn't show up at the preliminary injunction hearing or at the T.I. hearing and stand up and argue that there was irreparable harm. He did between the T.R.O. and the preliminary injunction and therefore we agreed to allow them to withdraw $20,000 a month in order to not have a burden on the family members. Can't earn a living. He hasn't worked in, as best we can tell, since he resigned from the company. Medical issues. None of this is in the record. He didn't show up at all for any of this evidence. It's inappropriate to be raising it before this Court. Post-injunctional wages. In fairness on that, he was asked a question by a member of the Court about whether $20,000 was enough, so I don't think he can be accused of trying to answer the Court's question. Fair point, Your Honor, but I do believe that if he's going to stand before you and argue that it's insufficient that he should have offered some evidence into the lower court before Judge Hoyt. As far as all these statements, this was not in response to the Court's question about the principles, not wanting their fingerprint. None of that's in the record. In fact, we would like to have . . . I don't expect that $20,000 a month. $20,000 you can live on, but you might not be able to live too well on it if you have to hire a lawyer to stand up against major law firms on the other side and generate all . . . do all this legal work. Fair point, Your Honor, but nobody's come back to us . . . $20,000 pretty fast in legal fees. Understood, but nobody's come back to us and said it's inadequate for any particular reason. My clients are reasonable people. If Mr. Alonzo is burning through all the fees and the family is short, we can certainly address that. I mean, what seems most odd to me is that your clients agreed to let them have $20,000 a month, but his salary while he was employed was $90,000 a year gross, which is, you know, less than $8,000 a month. Correct, Your Honor. The reason we did that is recognizing . . . Generous severance. The reason for that, Your Honor, is it was originally $10,000 a month that we reached a stipulation with plaintiffs' counsel . . . I mean, defendants' counsel, excuse me, for the $20,000, and now on the appeal they complain about it. It still doesn't all make complete sense, is what I'm saying, for him to be getting paid double after you're suing him compared to what he was getting before. We tried to acknowledge he was going to need the representation to defend himself in this matter, Your Honor. Basically, what you seem to be saying is that you have a very elaborate scheme of distributing money to deceive. And the question is, who was being deceived? And his suggestion is that, well, the people who are suing me were the ones that structured it this way. We were deceiving the governments and so forth so they could operate. In other words, they're saying essentially that your clients were running this, whatever label you want to put on it, this elaborate arrangement to avoid maintaining anonymity, et cetera, and then what you're saying is that, yes, that's so, but then he was skimming off the top of it. First point, Your Honor, there's no evidence of us setting up a scheme for whatever purpose. Second thing is he stole our money, and that's the distinction. The particular arrangements whereby you're moving money all over, that has some purpose behind it. But, Your Honor, we didn't do that. It was frivolous when I said that when you set out to avoid your identity to go in disguise that you're set about the business of deceiving somebody. Let me try to address the facts, Your Honor. The facts are that there are South American customers that want steel for water treatment facilities, et cetera. The Chinese were manufacturing a lot of steel. We were an intermediary procurement arm responsible for entering into a contract to buy the steel. You didn't know this money was being moved around? Your client didn't know this money was being moved around? No, Your Honor. If you track the record, what we did know is the buyer is paying, should be, JFA, Jafang Americas, and then Jafang Americas is supposed to be paying the steel suppliers. The problem is when you take 45 bank accounts and use a bunch of DBAs of the actual steel suppliers, if we were to go look at the books and records, which were maintained by the defendant 100%, you would see the payments going in from the buyer and out to the steel supplier, but they weren't really going to the steel supplier. They would go through this chain of other companies with 45 different bank accounts, six shell entities. You didn't know those existed? No, Your Honor. Not at all. Not until this litigation was commenced and we started taking discovery. And to address, I believe, Your Honor's question, did we take the deposition? Yes, I actually took that deposition, and I specifically asked him numerous times to explain what was the intended purpose of this particular wire transfer? What was the intended purpose of this transaction? Why did you set up this shell entity? And contrary to what counsel said, we did not get an answer to those questions, and the record's very clear in that respect. What was the evidence about the transfer of money to the father-in-law? Well, there's several, Your Honor. We became suspicious of the defendant's activities. We started asking questions about it. Once again, he refused to answer. He showed up on our doorstep on July 1 and resigned. Immediately after that, he jumped on an airplane and went to Hong Kong with his father-in-law, who had never been on a business trip with him ever in the past, and they withdrew, I believe, Your Honor, the numbers are far in excess of $1 million and close to $1.5 million, which he gave some of the money from the bank accounts in Hong Kong to his father-in-law directly, the check issued to him. The remainder he gave to him in Houston, in the amount of like $450,000 in Houston, was turned over to his father-in-law, allegedly for investment purposes. There's been no explanation to that. He's never had a history of investing with his father-in-law at any point in time in the history of their relationship, and he has refused to account for that. He's refused to turn over the bank records for that, and so we're out subpoenaing all the Hong Kong bank account records, which now I'm getting beyond the date of the preliminary injunction. Your Honor, the next question or statement by counsel is what was referred to as DX11, Defendant's Exhibit 11, at the record of 1851, addressed everything. If the Court takes a look at DX11, actually I believe this exhibit raises more questions than were answered. It's a summary. The appellant did not produce the backup records. The appellant's own chart demonstrates a very, very large differential between the purchase price being billed to the buyers and the purchase price being paid to the manufacturers or sellers in China. The problem is it lists actual factory agents. Those actual factory agents, Xingmin and Shanwei and BMSI, are nothing more than companies created by the defendants and his co-conspirators to funnel money around through the various bank accounts. Our client has been in this business of procurement for many, many years. They've never used a factory agent, and in fact the defendant worked for us for many years without ever having used a factory agent, once again was unable to explain to us in deposition why he suddenly had to have this intermediary. The defendant worked for you for four or five years, right? From 2007 through 2014, Your Honor. Okay, seven years. And my understanding is that he became the company's principal intermediary for Chinese business, right? That is correct, Your Honor. Okay. And so he operated out of his own one office in Houston. ATN's office is somewhere in Florida. And they entrusted him with these multimillion-dollar transactions, right? That's correct, Your Honor. And they never had an audit done in the three or four years that these shell companies were allegedly operating? Your Honor, he had come to work for us at the recommendation of one of Mr. Benedict's longtime friends, Mr. Schwartz,  the fraud was even ongoing. It's easy to, with the benefit of hindsight, should they have had a team of auditors in there? What was his salary again? $90,000. Approximately $90,000, Your Honor. $90,000 a year, as your top guy, to make these millions of dollars of transactions? I'm sorry, Your Honor? I just was puzzled that the compensation package for someone that you entrust with that level of responsibility. Well, but let's back up, Your Honor. It's really nothing more than we're seeing a check from a buyer come in, and a check go out to the steel supplier, and typically in progress payments, and then the contracting for the shipping of the pipes across, I guess, the Pacific, and a few other things. The accounting should not be that complicated. The problem was is we had no idea, and we would look at the records. It was a lot more complicated than we expected. That I can attest, having tried to wade through these records. This is such a big company. Didn't they have audited financial statements? It's not such a big company, Your Honor. It's a procurement company. This is not a multi-level. Doesn't it have a CPA? Does ATN have a CPA? Yeah. I mean, presumably you were paying taxes on the difference between the invoice price and the supply price of the steel. Well, Your Honor, but the only thing I would push back on that is you have to have a profit, show a profit. We didn't realize we were being deceived to the magnitude that we were, so I don't know what the . . . But what I'm saying is unless he falsified the invoices to you, you knew what you were billing the Venezuelan purchasers. I mean, ATN knew that, didn't it? We knew what we were billing the purchasers. Right, so you knew what the markup was. No, Your Honor, we didn't because the steel invoices were changed internally and did not always match the purchase price. He would get the real invoice from the steel supplier for the manufacturer of the steel. He would then create another invoice and do back-to-back entries internally within the shell companies. ATN owes an awful lot of back taxes if they're paying U.S. taxes. That's . . . I can't quibble the court. That certainly could be a possibility when this mess unravels, if we ever get our money back and we actually owe it and we don't have a loss for theft, I suppose that's possible. If you don't get to trial and get a judgment pretty fast at $20,000 a month, there isn't going to be much money. Well, except for the many millions that we haven't yet discovered. Your Honor, I would also point out we are set for trial in December, so we're trying to go very quickly and compliments to counsel. He's worked very hard to try to get prepared also. We probably won't get reached in December, but soon thereafter, hopefully, Your Honor. Could I please address Mr. Alonzo's statement? I believe he was quoting from record page 4920, but it does sound from what he read to us that Judge Hoyt was putting the burden on him rather than on you. I don't think Judge Hoyt put the burden on him. I think what Judge Hoyt said is come forward and show me some evidence that relates to the allegations that are being made. I believe as Judge . . . He put the word burden in what he quoted to us. I'm assuming he did so accurately. I don't quibble with his reading from the transcript, Your Honor. I would say, though, that I believe Judge Igbenbotham made the appropriate statement of Judge Jones. We couldn't answer those questions. The only person that could have showed up that day in court and testified or in his depositions answered the questions. And I think it's very important. This is sort of getting lost in the shuffle, too. We had the one day of evidentiary hearings, and then the judge allowed the parties to engage in some limited discovery, get some access to the QuickBooks, try to understand the transactions, and go take the deposition of Mr. Groves to try to get an understanding. If he could so clearly walk me through the invoices and explain it to us, we certainly would have listened. But he couldn't. And not only that, more importantly, he refused to do so. Before we finish up, I do have a question about standing of your clients because it is not clear to me that Mr. Benedict was a shareholder of Jafang from the beginning. If this fellow, Mr. Fletcher, the Chinese Mr. Fletcher, set up Jafang and Benedict and Carvinist didn't open it until . . . didn't take it over until 2013, I think there's some other standing questions about this case as well. Certainly, Your Honor. First of all, with respect to Jafang Americas, the evidence is clear that the attorney in Houston that formed Jafang Americas issued the original minutes in December of 2008, and it shows very clearly signed by the attorney, and we have the original in his blue ink signature showing that Mr. Benedict and Mr. Cardenas were both 50% owners of the company. In discovery, some documents were produced by Mr. Groves that showed that the stock was in the hands of Mr. Fletcher. It's an acronym for his Chinese name. And then clearly, this is undisputed, that there's some additional documents. I should also add that those appear to be stamped by the attorney, not hand-signed. We've never seen the originals, notwithstanding the fact that we've requested them. So the only originals are the ones showing in 2008 continuously that my clients have owned the stock. Secondly, the stock, even under their theory of the case, was transferred in 2013. The claims and causes of action, it's a red herring, Your Honor. What they're trying to assert in the cases they cite are derivative standing cases. We're not asserting a claim in derivative shareholder capacity. We're alleging that the corporation itself owns these claims and causes of action. We just happen to be the owners, Mr. Benedis and Cardenas. And so the corporation has the right to sue for the fraud and embezzlement by its employee. Well, you went the extra mile by naming Benedis and didn't you name Cardenas? Yeah, Benedis is personally named. Mr. Benedis personally wrote numerous checks. Numerous is an exaggeration. He wrote several checks or wire transfers, one in the amount of $775,000, and we believe that in and of itself is enough to give him standing. He is not suing in his capacity as a shareholder of JFA. I see. And how is ATN a proper plaintiff? ATN made, I think it's to the tune of over $6.5 million in payments to Gulf Maritime, one of the defendants in this case. There were numerous wire transfers directly from ATN. Prior to the incorporation of JFA, ATN was acting as the procurement arm for the steel contract. Why do you think Gross was the malefactor in that as opposed to the Chinese Zhu or whoever it was? Because Mr. Gross was the one that introduced Mr. Jin and his wife and recommended it and, in fact, sent us the invoices from Gulf Maritime requesting that we make the payments, only did we find out recently that Gulf Maritime was not the Gulf Maritime that actually owns the ships. This is Gulf Maritime Hong Kong company that has just a shell office in Hong Kong. And it's worth noting, Your Honor, that of the six companies registered in Hong Kong owned by the defendants, all of them have the same business address, no phone, no employees, no business activity, and Mr. Gross testified undisputed, no accounting records, no tax returns. Your Honor, briefly in my last couple minutes, I want to just address a couple of the other arguments or points of issue. They argue that with respect to issues five, six, and seven, we believe they're untimely as set forth in our papers. We think some of them, well, several of them are issues raised for the first time on appeal. The order releasing funds, the notice of appeal was not filed within 30 days of entry of the order. With respect to the, secondly, there was no garnishment. There's not a third party being served with a garnishment pleading to apply collection of monies to a third party debt. This is simply a preliminary injunction. As far as the existence of non-tainted funds, the defendant showed up after the hearing on the preliminary injunction in a motion for reconsideration, which has not been appealed, and filed a list of three alleged transfers, a condominium in South America, a car, and I think a country club membership or some club membership where he recovered a couple hundred thousand dollars seven years prior. He did not offer a shred of evidence that the cash that was in the accounts that's being enjoined is the same cash, and it's just not believable that that cash, cash is fungible, and he certainly couldn't trace it or identify that he'd had a segregated account. In conclusion, we believe that the district court's finding of the fact are not clearly erroneous. We believe we've met our burden with respect to substantial harm. It's very clear that the monies can disappear. It has already been evidenced and admitted by Mr. Gross that he's already moved millions of dollars offshore  His story is just simply not credible, and we respectfully request that the court affirm the judgment. All right. Thank you, sir. Thank you, Your Honor. Mr. Alonzo? Is it Yosel or Alonzo? Yosel. Yosel, excuse me. Alonzo is my last name, Your Honor. Alonzo is the last name? Yes. Right, that's what I thought. Unusual name. That's right. We call each other lots of things. Sorry. Your Honor, what is actually inconceivable is that they can stand before you and claim that they owned Jafang Americas when the documents that we offered in evidence, the defendants' exhibits, show that the only documents that they provided to the Venezuelan government were documents showing Fletcher as the owner of Jafang Americas. And there were several times that they did this. They did this for bank loans. They did this with regard to Jafang Americas. They did this with regard to a hydrocapital contract. It's not a red herring, and the reason it's not a red herring is because Fletcher was the individual on behalf of Shanghai Jafang who was directing Mr. Gross's activities on the Chinese side. So as we discussed earlier, he had full knowledge. He not only had full knowledge, he was actually giving the instructions through 2013. In 2013, they again signed, and this is, I believe, there's no question, this is the only time that both Fletcher and the principals for the plaintiff, who are not U.S. citizens, are Venezuelan citizens, signed the same document, and that document transfers the ownership of the company from Fletcher to the two Venezuelan nationals that are their principals. And they signed those documents showing that there's a transfer in January of 2013. So there's no doubt about that. There's also no doubt about the fact that you have the corporate book in front of you. There are no certificates that have ever been issued with regard to Jafang Americas at all. And so the documentary evidence that we have and that we believe is correct is that the Venezuelan principals did not want to show their ownership of these companies in Venezuela for the reasons I've enunciated. Did he offer that explanation in his deposition? Pardon, Your Honor? Did he offer that explanation he has given in his deposition?  And Mr. Gross also went through the transactions, Judge Higginbotham, and not only that, Judge, you still, even after counsel's presentation, I still have not heard of one misappropriated payment with regard to the summaries that we provided that are anchored in the record, anchored in the testimony. Well, look at the deposition. It says what it is, what it is. So you seem to be poles apart in what happened at the deposition. Well, and here's . . . And I think that's very important to your case. And we are poles apart because you've also now heard the way that the burden of proof has been reversed. I've always understood that in America one was free to earn an income, however . . . When I talk about the burden of proof, I'm talking about the oath he took when he took his deposition. If he refuses to answer questions, I don't know. You differ. It doesn't matter. I'll resolve it by looking at the deposition. But I just wanted to give you a fair warning that I think that if he was evasive, refused to give the information, etc., etc., that's hurtful to your cause. He gave the information. He did not refuse to provide any information. And you've just heard counsel say, well, it was incumbent on us to trace how my client has all the money that he has in his bank accounts. Really? Is that really a defendant's burden of proof in America when you're sued? Is it our burden to show that? No, of course not. It is the plaintiff's burden to show that any funds that we have in the accounts were somehow misappropriated. But they can't sustain that burden and haven't sustained that burden today. Now, a couple of these issues I do want to address. Mrs. Gross, goodness sakes, they knew about BMSI since 2008. They knew that she was involved. They knew about the company. She was an officer of the company. BMSI, yes. She was a manager of the company. But they knew that. How can you possibly be sued over four years after the fact for being involved in a company that the plaintiff admittedly knew about, and that's in their complaint? It's called community property. Pardon? It's called community property. Judge, that can be addressed through the Dragnet provision in Rule 65 in terms of not transferring assets or aiding and abetting someone. What's the practical difference? The practical difference is she's being sued personally for not having done anything. Nothing. Nothing. Can you do that? I don't think so. Thank you. Okay. Thank you very much.